IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:15-cr-511-KKD-GMB |
| | ) | |
| KEVIN LAVARIUS MARTIN; and | ) | |
| TREMANE DARNELL CARTHEN | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the court are Defendant Kevin Lavarius Martin's Motion to Suppress (Doc. 56) and Defendant Tremane Darnell Carthen's Motion to Sever Defendant's Trial, as amended (Docs. 55 & 142).[1]  The court held an evidentiary hearing on the motion to suppress on August 2, 2016, and has reviewed the Government's response to that motion (Doc. 164) and Martin's reply in support (Doc. 166), along with the Government's response (Doc. 93) and amended response to the motion to sever (Doc. 162).  For the reasons stated herein, the Magistrate Judge RECOMMENDS that Martin's Motion to Suppress (Doc. 56) be DENIED and Carthen's Motion to Sever Defendant's Trial (Doc. 55) be GRANTED in part and DENIED in part, as set forth below.

## I.  BACKGROUND

Martin and Carthen were indicted along with Scottie Jeroma Groce for various charges stemming from a series of armed convenience store robberies that occurred

---

[1] Carthen's Amendment to Motion to Sever also contains a request for leave to file other motions. *See* Doc. 142.  Carthen does not describe with specificity the motions he intends to file, nor does he attach a copy of the proposed motions to his request for leave.   The court will not grant a blanket authorization to file hypothetical motions on such a sparse showing.

between July 4, 2014 and July 14, 2014 in Autauga and Elmore Counties. *See* Doc. 4. Soon after the crimes were committed, law enforcement began to receive anonymous tips implicating the three defendants in the robberies. Transcript of August 2, 2016 Hearing ("Tr.") at 26.   On July 24, 2014, officers from the Autauga County Sheriff's Office ("ACSO"), the United States Marshals Service Gulf Coast Regional Fugitive Task Force, and other agencies arrested all three defendants. Tr. at 5–6.

Montgomery Police Department Officer David Hill participated in Martin's arrest and transported him from his home to another location where the officers from the arrest teams reconvened. Tr. at 5–6.   Once there, Officer Hill testified that Martin said, "Hey let me talk to Conway," which Hill interpreted to be a reference to Lieutenant Tommy Conway ("Lt. Conway"), a narcotics investigator with the ACSO, who was on scene at the time. Tr. at 8.   To accommodate Martin's request, Hill approached Lt. Conway and told him that Martin would like to speak with him. Tr. at 9.   According to Lt. Conway, he then walked to Hill's vehicle, knocked on the window, and introduced himself to Martin. Tr. at 38–39.   Although the two had not met previously, Lt. Conway had investigated multiple members of Martin's family during his narcotics work. Tr. at 39. Lt. Conway was not familiar with the robbery investigation, and testified that he merely told Martin that he would be transported to the ACSO to meet with the appropriate investigators. Tr. at 38 & 40.

Martin testified on his own behalf during the court's August 2, 2016 evidentiary hearing under an agreement that the scope of his testimony would be limited to the facts

surrounding his confession. Tr. at 3.   He told a different version of these events, insisting that he never asked to speak to Lt. Conway. Tr. at 69–70.   Instead, Martin said he was handcuffed in the back of Hill's vehicle when a man he did not know—later identified as Lt. Conway—knocked on the window and asked, "Do you know who I am?" Tr. at 70.   When Martin replied that he did not know, Lt. Conway said, "I'll tell you when we get to the station," and walked away. Tr. at 70.

After Lt. Conway's conversation with Martin, Officer Hill drove Martin to the ACSO, where he was placed in an interview room. Tr. at 71.   Jennifer Conway ("Agent Conway"),[2] who is the Resident Agent in Charge of the Montgomery, Alabama Field Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), arrived at the ACSO and attempted to interview Martin. Tr. at 14–15.   Agent Conway read him a standard ATF *Miranda* rights form and had him sign the form to acknowledge that he understood his constitutional rights, including the rights to remain silent and to have an attorney present. Tr. at 16.   At this time, Martin refused to provide a statement and demanded a lawyer. Tr. at 16.   The parties have stipulated that this was an unequivocal invocation of Martin's Fifth Amendment right to an attorney during this custodial pre-indictment interview. Tr. at 3.   Agent Conway immediately terminated the interview. Tr. at 17.

As Agent Conway lead Martin out of the interview room, she testified that he

---

[2] Both Lt. Tommy Conway and Agent Jennifer Conway testified at the evidentiary hearing on Martin's motion to suppress.   To avoid confusion, the parties used the designations "Lt. Conway" and "Agent Conway" to differentiate between these two individuals during the hearing.   The court will use the same titles in this recommendation.

asked to smoke a cigarette. Tr. at 18.   A number of law enforcement personnel were standing in the hallway outside the interview room at the time, but Lt. Conway was the only one in the immediate area who worked for ACSO. Tr. at 43.   Realizing that only he possessed a badge that would allow them return access from the exterior of the building, Lt. Conway obtained a cigarette from another officer and lead Martin through an exterior door and onto the top level of the fire-escape structure outside. Tr. at 43–44.   Martin testified that he asked for Lt. Conway to accompany him because Lt. Conway knew his family, Tr. at 76, but neither Lt. Conway nor Agent Conway testified to having heard Martin ask for Lt. Conway by name. *See* Tr. at 18 & 42–43.

What happened on the fire escape is in dispute, as only Lt. Conway and Martin were present and their testimony is contradictory.   According to Martin, Lt. Conway lit his cigarette and "told me to come clean and that Mr. Groce had already told the folks who I was and gave a statement on me and I needed to be the first one to cooperate." Tr. at 63.   Lt. Conway clarified, "First one to come clean get a better deal." Tr. at 63.   Lt. Conway then told Martin to call his brother, Tevin Martin, because Tevin owed Lt. Conway "a favor." Tr. at 64.   Lt. Conway dialed Tevin's phone number and put the call on speakerphone. Tr. at 64 & 84.   When Tevin answered, he advised Martin that Lt. Conway was "full of mess" and not to be trusted. Tr. at 64 & 93.   Following the call, Lt. Conway said, "[I]f you get me somebody worth $500,000, I'll get all the charges dropped on you." Tr. at 65.   Martin took this to mean that Lt. Conway wanted him to "bust somebody." Tr. at 65.   Martin testified that he did not respond to these entreaties, but

was nevertheless escorted back to the interview room after he finished his cigarette. Tr. at 65.   Martin said that he asked Agent Conway to see the evidence against him that morning during their initial interview, but he did not repeat this request to Lt. Conway on the fire escape. Tr. at 65–66.

Lt. Conway, on the other hand, testified that Martin was the first to speak on the fire escape, asking him either, "What am I going to do or what do I need to do, Conway?" Tr. at 44.   Lt. Conway "told him that basically I had nothing to do with the investigation and that . . . I didn't do robbery cases.   I investigated drug crimes. . . [B]ut I told him, I said, basically, on a drug crime, I know that, you know, usually the first person that starts talking and gives up information is the first person that gets the best deal." Tr. at 44. Martin then asked to see the evidence against him, and Lt. Conway agreed that he would ask the investigators assigned to the case to show him what they had. Tr. at 44.   Lt. Conway does not remember placing a phone call to Martin's brother during this conversation, but acknowledged that he does know Martin's family. Tr. at 39 & 45.   At some point during the conversation Martin stated, "I'll talk to them," and asked Lt. Conway to be present during the interview. Tr. at 46–47.   The two men then walked inside, where Lt. Conway informed Agent Conway and the other investigators that Martin wanted to talk with them. Tr. at 48.   Outside in the hallway, Lt. Conway then announced to the assembled investigators that Martin wanted to see the evidence they had against him. Tr. at 49.

After the investigators reassembled, the interview was video recorded.

5

Government's Exhibit 1 to August 2, 2016 Hearing ("Gov't Ex. 1").[3]   As the recording

begins, Lt. Conway, Detective Betts of the Elmore County Sheriff's Office, and Martin

are seated around a table, while Agent Conway is standing with her bag on the table.

Gov't Ex. 1 at 11:27:55.[4]   After thumbing through files in her bag, Agent Conway spoke

first, turning to Lt. Conway to ask, "Oh, he just wants to see the pictures?" Gov't Ex. 1 at

11:27:55.   Agent Conway then turned to Martin and continued, "That's all you want to

do is see the pictures?" Gov't Ex. 1 at 11:27:58.   Lt. Conway answered Agent Conway's

question, "He wants to know what you got," then told Martin, "I'm 'on show it to you."

Gov't Ex. 1 at 11:28:00.   Lt. Conway read Martin his *Miranda* rights, including his right

to counsel, from a form that he passed to Martin to read and to sign, which Martin did.

Gov't Ex. 1 at 11:28:10–29:53.   Following this advisement of rights, Lt. Conway told

Martin, "I'm going to show you some stuff, okay, like I said.   I think that's what . . . you

just want to see some evidence, right?   I'm 'on show you that.   Okay?" Gov't Ex. 1 at

11:30:00.   Martin responded with a nod of his head. Gov't Ex. 1 at 11:30:13.

    As Lt. Conway promised, the investigators outlined some of the evidence

collected during the robberies, including photographs and physical items recovered from

the robbery scenes, for approximately the next twenty-seven minutes. Gov't Ex. 1 at

11:30:13–57:42.   During this time, Lt. Conway remarked, "Again, you need to be trying

---

[3] For reasons unknown to the law enforcement witnesses who testified during the evidentiary hearing, the first interview—during which Martin invoked his rights—was not recorded, or at least the recording was not preserved. *See* Tr. at 28.
[4] All listed times reflect the time stamp on the video recording of the interview admitted as evidence during the court's evidentiary hearing. These times have not been authenticated as accurate and are included only for reference.

to come forward      . . . and talk . . . and, and try to work something out, you see what I'm saying, instead of trying to play hard.   That's what I was trying to tell you." Gov't Ex. 1 at 11:33:19–30.   As the interviewed veered into a discussion of Martin's cooperation, Martin asked the investigators, "What would you do?" Gov't Ex. 1 at 11:40:04.   The investigators gave their opinions on the benefits of a full and truthful confession, and Martin eventually called Detective Kearley of the ACSO into the room before announcing his responsibility for "all of them," which he clarified to mean the three robberies under investigation. Gov't Ex. 1 at 11:40:07–57:49.   Following this admission, Martin confessed to the robberies and inculpated his co-defendants Groce and Carthen. Gov't Ex. 1 at 11:57:49–12:44:19.

## II.   DISCUSSION

### A.   Motion to Suppress

The legal issues associated with Martin's motion to suppress are straightforward, but the facts are hotly disputed.   The parties have stipulated that Martin unequivocally invoked his right to counsel when Agent Conway first interviewed him. *See* Tr. at 3. The uncontroverted evidence before the court is that Martin's request for an attorney was scrupulously honored at that time, with Agent Conway ending the interview immediately. Tr. at 17.   This response complied with the Supreme Court's mandate that "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Edwards v. Arizona*, 451 U.S.

477, 484–85 (1981)).   Yet Martin's interview later continued, and eventually resulted in self-incrimination.   In the interim, Martin and Lt. Conway—and only Martin and Lt. Conway—retired to the fire escape outside the ACSO for Martin to smoke a cigarette. Lt. Conway claimed Martin spoke first on the fire escape, asking him for advice. Martin, on the other hand, testified that Lt. Conway spoke first, pressuring him to come clean.

The outcome of Martin's motion to suppress thus turns on a credibility determination pitting Martin against Lt. Conway.   After careful consideration, the court finds Lt. Conway's testimony regarding the fire-escape conversation to be more credible than Martin's version.   Such determinations of credibility "are typically the province of the fact finder because the fact finder personally observes the testimony." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (citing *Viehman v. Schweiker*, 679 F.2d 223, 227–28 (11th Cir. 1982)).   In pretrial criminal matters, the magistrate judge serves in the jury's traditional role as factfinder. *See Ramirez-Chilel*, 289 F.3d at 749 ("[I]n evaluating the factual version of events between the law enforcement officers and Ramirez-Chilel, we should defer to the magistrate judge's determinations unless his understanding of the facts appears to be 'unbelievable.'") (citing *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985), for the holding "that a jury's decision as to the credibility of a witness would not be disturbed on appeal unless the witness's testimony was unbelievable on its face").   As factfinder, the court is guided by the same factors traditionally found to be determinative of credibility in the eyes of the jury, including the

8

demeanor and apparent candor of the witnesses, any personal interest or other reason to fabricate testimony, and any conflicts between the testimony and other evidence. *See, e.g.*, *Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999) (remanding for trial court's failure to consider "internal consistency of the defendant's testimony, or his candor or demeanor on the stand" in assessing competing credibility of witnesses); 11th Cir. Pattern Jury Instructions (2010) at 5, Credibility of Witnesses.

Here, nothing about Lt. Conway's demeanor during the evidentiary hearing gave the court pause.  He was confident and direct in his answers and courteous to both the prosecutor and defense attorney.   Lt. Conway appeared candid in his answers, even admitting that there were portions of the critical conversation that he did not remember precisely. *See* Tr. at 45 ("I'm not saying that didn't happen.   I just don't recall it."). Martin was more circumspect and frequently hesitated in responding to cross-examination, projecting less confidence in his testimony when contrasted with Lt. Conway's appearance and delivery on the stand.   This being said, the court recognizes that Martin is not a veteran law enforcement officer trained to testify in court and that the prosecutor tested Martin with legal concepts and terminology that are outside the normal vocabulary and conversation of many lay people. *See, e.g.*, Tr. at 110 ("And it was to get that offer or an acceptance of that offer that you gave your confession.").   As a result, the court does not draw any meaningful credibility inference in Lt. Conway's favor based on Martin's less-confident demeanor.

With respect to the witnesses' motivation, Martin does have a legitimate reason to

fabricate his story in as much as his personal freedom is at stake.   Lt. Conway has retired from law enforcement—and was not the investigator assigned to the robberies even before retirement—indicating relatively little personal interest in the outcome of the investigation. *See* Tr. at 36.   However, Lt. Conway is married to Agent Conway, who serves as the case agent for the federal charges arising out of the robberies. Tr. at 23. By virtue of this relationship, the court will not indulge the fantasy that Lt. Conway is wholly disinterested in the outcome of this proceeding.   These respective motivations for fabrication weigh in favor of Lt. Conway's credibility, but do not carry the day alone.

Tipping the scales heavily in Lt. Conway's favor are the external corroboration of his version of events and the internal inconsistencies inherent in Martin's.   Most critically, the very opening lines of the video recording cannot be squared with Martin's version of the fire-escape conversation.   As stated above, on the video Agent Conway asks Lt. Conway, "Oh, he just wants to see the pictures?"   She then turns to Martin and continues, "That's all you want to do is see the pictures?"   Lt. Conway answers for Martin, "He wants to know what you got."   This exchange follows logically if, as Lt. Conway testified, Martin requested on the fire escape to see the evidence before deciding whether to incriminate himself, and then Lt. Conway relayed this request to Agent Conway.   But it makes no sense for Agent Conway to ask Lt. Conway what Martin wants to see if she is the one who heard that request during their initial, aborted interview, as Martin claimed under oath.

Other portions of the videotaped interview also reinforce Lt. Conway's version of

10

events and undercut Martin's.  For example, the video reveals extensive discussion of the benefits to be gained by Martin's cooperation, yet Martin never once mentions any deal proposed by Lt. Conway, whether contingent on proactive cooperation or a true confession. *See, e.g.*, Gov't Ex. 1 at 11:38:22–40:05.  Lt. Conway, for his own part, makes clear that Martin should negotiate with the investigators on his case, as he claims to have told Martin on the fire escape. *See, e.g.*, Gov't Ex. 1 at 11:38:30 ("That's what we, that's what we were talking about earlier—they can help you brother.").   The video also contradicts Martin's testimony that he was never asked if he understood his rights, only commanded to sign the advisement of rights form. *Compare* Gov't Ex. 1 at 11:28:34 (responding, "Yeah," to Lt. Conway's question, "You understand all that, right?"), *with* Tr. at 94 (maintaining that "[n]obody ever asked" if he understood his rights).

While not directly relevant to the reinitiation of Martin's interview, Officer Hill's testimony corroborates Lt. Conway on another fact in dispute.   Officer Hill's statement that Martin specifically requested to speak with Lt. Conway on the morning of his arrest jibes with Lt. Conway's testimony on this point.   Officer Hill has no apparent motive to make up this story, as he serves a law enforcement agency with no involvement in the robberies at issue, played no role in the investigation other than to assist in Martin's apprehension, and does not even share Lt. Conway's familial relationship with one of the investigators.   This third-party corroboration of Lt. Conway buttresses the court's finding that Lt. Conway's testimony is truthful.

Finally, Martin's testimony suffers from a number of internal inconsistencies and

logical problems that cast further doubt on his version of events.   Most critically, if Martin is to be believed, the core argument Lt. Conway used to convince him to confess is nonsensical.   According to Martin, Lt. Conway stated in the same breath that "Groce has already told the folks who I was and gave a statement on me" and also that "I needed to be the first one to cooperate." Tr. at 63.   Martin had no explanation when pressed on how Groce could have already confessed but someone else could still be the first to cooperate. *See* Tr. at 80.   Nor could Martin explain convincingly why he believed Lt. Conway's purported promises when his brother told him over the phone that Lt. Conway was not to be trusted. *See* Tr. at 84–85 (justifying his trust in Lt. Conway, with somewhat circular logic, on the fact that Lt. Conway claimed responsibility for getting his brother out of jail).   At other times, Martin's testimony merely changed course midstream. *See* Tr. at 67 ("Q. And did you make that statement based on the representation made to you by Lieutenant Conway while you were outside?   A. Right"); Tr. at 90 ("Q. Okay.   So you didn't talk to the officers based on your belief that you had been offered help by Lieutenant Conway.   A. No, ma'am."); Tr. at 83 ("Q. Okay.   And Agent Conway. You understood you had the right to an attorney.   A. Yeah."); Tr. at 94 ("Q. And is it your position now that you didn't understand your right to counsel.   A. No.   I never understood.").   For all of these reasons, the court finds Lt. Conway's account of the critical fire-escape conversation to be more credible than Martin's. *See, e.g.*, *United States v. Cofield*, 272 F.3d 1303, 1305 (11th Cir. 2001) (overturning district court's rejection of magistrate judge's credibility findings, which were based on "each officer's

12

demeanor and manner of testifying, as well as the consistency and logic of their rendition of the events").

Because the court credits Lt. Conway's testimony, the conclusion follows that Martin "himself initiate[d] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485.   While the *Edwards* rule reaches a narrower set of inquiries than "initiate" in "the ordinary dictionary sense of that word," Martin's substantive plea for advice qualifies as a voluntary reinitiation of the recently suspended discourse with law enforcement. *See, e.g.*, *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (contrasting the suspect's question—"Well, what is going to happen to me now?"—with routine inquiries such as "a request for a drink of water or a request to use a telephone").

The finding that Martin reinitiated the conversation and thus there is no violation of the *Edwards* rule does not end the analysis. *See Bradshaw*, 462 U.S. at 1045.   The court must still consider "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances." *Edwards*, 451 U.S. at 486 n.9. The Government bears the burden of proving this waiver. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. . . . [But] if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant

voluntarily waived his privilege against self-incrimination.").

The Government has carried its burden.   The relevant advisement of rights and waiver are captured on the video introduced into evidence at the August 2, 2016 hearing. As noted above, Lt. Conway read Martin's rights to him. Gov't Ex. 1 at 11:28:10–29:53. Lt. Conway then confirmed Martin understood these rights, which Martin acknowledged both verbally and in writing. Gov't Ex. 1 at 11:28:35 & 11:29:43.   Martin reviewed the single-page advisement-of-rights form for almost thirty seconds in silence before deciding to sign it. Gov't Ex. 1 at 11:29:17–43.   Martin's previous invocation of his right to counsel also belies any claim that he did not understand this right at a later time during the same day.   On these facts, the Government has carried its burden of proving Martin's knowing and intelligent waiver of his right to have counsel present during his interview.   The motion to suppress is due to be denied.[5]

## B.    Motion to Sever

Also pending is Carthen's motion to sever his trial from his co-defendants' trials. Carthen argues with citation to *Bruton v. United States*, 391 U.S. 123 (1968), that his rights under the Confrontation Clause will be violated if he is tried along with his co-defendants, who each gave recorded co-implicating confessions. *See* Doc. 55 at 2.

---

[5] The Government's response to the motion to suppress also references a fruit-of-the-poisonous tree argument. Doc. 164 at 7–8.   Martin raised this argument in his motion only by arguing in the conclusory paragraph for the suppression of the "fruits of such . . . unlawful interrogation." Doc. 56 at 6.   If this is merely a reference to any evidence obtained as a result of Martin's confession, the court recommends that this request be denied since the confession was not obtained illegally.   To the extent, on the other hand, that Martin intends to re-litigate the impact of his co-defendant Groce's illegally obtained confession, he has not raised any specific objection to the court's finding regarding the inevitable discovery exception or given any other reason to reconsider this now-adopted recommendation. *See* Docs. 164 at 13–15 (finding applicability of exception) & 148 (adopting recommendation).

Groce's confession has been suppressed, however, and may not be used at trial. *See* Docs. 129 & 148.   This suppression of evidence undermines Carthen's argument for severing his trial from Groce's, and the court recommends the motion be denied to the extent Carthen seeks severance from Groce.   There is no basis under *Bruton* for Groce and Carthen to be tried separately, as neither gave a confession that could be admissible at their joint trial.

The court is not recommending, however, that Martin's confession be suppressed. While under certain, limited circumstances a *Bruton* issue may be cured by redaction and proper limiting instructions, *see Richardson v. Marsh*, 481 U.S. 200, 209 (1987), the Government has assessed this course of action and determined that it is not appropriate.[6] Specifically, the Government has no opposition to severing Carthen's (and Groce's) trial from Martin's trial in the event Martin's motion to suppress is denied. Doc. 162 at 1.   In light of the recommended denial of Martin's motion, the court recommends that the trial of Carthen and Groce be severed from Martin's trial for good cause and without opposition.

### III.   CONCLUSION

Accordingly, the RECOMMENDATION of the Magistrate Judge is as follows:

1.   Martin's Motion to Suppress (Doc. 56) be DENIED;

2.   Carthen's Motion to Sever Defendant's Trial (Doc. 55) be GRANTED to

---

[6] The court has independently assessed the potential for redaction of facially or contextually linked incriminating statements by viewing the video recording of Martin's confession (Gov't Ex. 1), and finds that compliance with the procedures set forth in *Richardson* and its progeny would be exceedingly difficult in this instance.

15

the extent he seeks to sever his trial from Martin's; and

3.      Carthen's Motion to Sever Defendant's Trial (Doc. 55) be DENIED in all other respects.

It is further ORDERED that the parties are DIRECTED to file any objections to this Recommendation on or before **August 19, 2016.**   Any objections filed must identify the specific findings in the Magistrate Judge's recommendation to which the party is objecting.   Frivolous, conclusive, or general objections will not be considered by the district court.   The parties are advised that this recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 9th day of August, 2016.

_____
          /s/ Gray M. Borden
UNITED STATES MAGISTRATE JUDGE